UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:12-CV-00186-JHM-HBB

CINCINNATI INSURANCE COMPANY                                              PLAINTIFF

V.

RICHIE ENTERPRISES LLC                                                    DEFENDANT

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on two dispositive motions: (1) the motion for declaratory judgment [DN 21] of Plaintiff Cincinnati Insurance Company ("Cincinnati"); and (2) the summary judgment motion [DN 20] of Defendant Richie Enterprises, LLC ("Richie"). Fully briefed, this matter is ripe for decision. For the following reasons, Cincinnati's motion for declaratory judgment [DN 21] is **DENIED** and Richie's summary judgment motion [DN 20] is **GRANTED** in part and **DENIED** in part.

### I. BACKGROUND

Richie is a pharmaceutical drug distributor incorporated in Kentucky. On June 26, 2012, the State of West Virginia, through its Attorney General ("AG"), sued Richie and twelve other pharmaceutical drug distributors, alleging that they illegally distributed controlled substances by supplying physicians and drugstores with drug quantities in excess of legitimate medical need. (See Compl. [DN 20-2] ¶¶ 2-3.) According to the AG, Richie and the other drug distribution companies became an integral part of the "pill mills" in West Virginia. (Id. ¶ 4.) The AG thus states that they are liable for the harms caused to the State of West Virginia. (Id. ¶ 2.)

In the West Virginia complaint, the AG asserts eight causes of action against Richie and the other drug distribution companies. In Count I, the AG alleges that the defendants violated the

1

state's Uniform Controlled Substances Act since they "failed to diligently respond to suspicious orders which the [d]efendants have filled" and "failed to provide effective controls and procedures to guard against diversion of controlled substances in contravention of West Virginia law." (Id. ¶ 16.) The AG alleges that through these failures, the defendants "willfully and repeatedly violated the Uniform Controlled Substances Act and corresponding regulations." (Id. ¶ 17.)

In Count II, the AG alleges that the defendants "willfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to customers" and "negligently acted with others to violate West Virginia's drug laws . . . ." (Id. ¶ 26.) Further, the AG alleges that the defendants are liable for "their negligence and by their reckless disregard of the customs, standards and practices within [d]efendants' own industry." (Id. ¶ 28.) In Count III, the AG alleges that the defendants violated the state's Consumer Credit and Protection Act by engaging in unfair or deceptive acts or practices in the conduct of trade or commerce. (Id. ¶¶ 29-35.) The AG further alleges that these violations "were and are willful." (Id. ¶ 36.)

In Count IV, the AG alleges that the defendants created a public nuisance by engaging in a pattern of distributing controlled substances well-known to be abused "in such quantities and with such frequency that the defendants knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes." (Id. ¶ 42.) In Count V, the AG alleges that the defendants "have been enriched unjustly by neglecting its duty of distributing drugs only for proper medical purposes . . . ." (Id. ¶ 49.)

In Count VI, the AG alleges a negligence claim against the defendants, stating that they had and breached "a duty to exercise reasonable care in the marketing, promotion and distribution of controlled substances." (Id. ¶¶ 52-53.) In addition, the AG alleges that the defendants "were negligent in failing to guard against third-party misconduct, i.e. the conduct of the so-called 'pill

mill' physicians and staff as well as corrupt pharmacists and staff and, in fact, by their actions the [d]efendants participated in such misconduct." (Id. ¶ 55.) The AG alleges that the defendants were negligent "in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers." (Id. ¶ 58.) Further, the AG alleges that the defendants "breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business." (Id. ¶ 59.)

In Count VII, the AG seeks a court-approved medical monitoring program for prescription drug users in West Virginia to aid in diagnosis, treatment, and research. (Id. ¶¶ 61-66.) Finally, in Count VIII, the AG alleges violations of the state's Antitrust Act. According to the AG, the defendants conspired with pill-mill physicians and pharmacists to restrain and monopolize trade, resulting in a restraint of trade (or having an anti-trust competitive effect on trade) by seeking to gain an advantage over law-abiding, careful wholesale distributors. (Id. ¶¶ 67-74.)

Once it was named as a defendant in the West Virginia lawsuit, Richie sought insurance defense from Cincinnati under its commercial general liability policy ("CGL policy"). Cincinnati, however, refused to provide Richie with a defense after concluding that West Virginia's claims against Richie do not fall within the CGL policy's limits. Cincinnati then filed this declaratory judgment action, seeking the Court's declaration that it has no duty to either defend or indemnify Richie with respect to the West Virginia action.

This matter is now before the Court because Cincinnati has filed a motion for declaratory judgment. In this motion, Cincinnati essentially seeks summary judgment on its declaratory claim. Richie has responded to Cincinnati's motion. Also, Richie has filed its own summary judgment motion. The Court will consider the parties' motions below.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## III. DISCUSSION

### A. DUTY TO PROVIDE DEFENSE

In the instant case, the pivotal issue is whether the underlying complaint alleges facts that require Cincinnati to provide Richie with a defense under the subject CGL policy. The CGL policy was in effect from September 30, 2008 until September 30, 2011. (See Policy [DN 21-3] 1.) Subject to certain limitations and exclusions, the policy states that Cincinnati "will pay those

sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' [that is caused by an 'occurrence']." The policy also states that Cincinnati has "the right and duty to defend the insured against any 'suit' seeking those damages." (Id. at 13.)

The CGL policy contains several definitions. "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Id. at 29.) "Property damage," by contrast, is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Id. at 32.) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 31.) The policy also contains an exclusionary provision for certain expected or intended injuries. It states: "This insurance does not apply to: . . . 'Bodily injury' or 'property damage' which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended." (Id. at 14.) Based on this policy language, the parties dispute: (1) whether the AG's complaint alleges an "occurrence"; (2) whether the AG's complaint alleges claims for "bodily injury" or "property damage"; and (3) whether the possibility of coverage is defeated by the policy's intentional and criminal act exclusion.

To address these three issues, the Court must determine the scope of the CGL policy in accordance with Kentucky law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Talley v. State Farm Fire & Cas. Co., 223 F.3d 323, 326 (6th Cir. 2000) ("In a diversity action involving an insurance contract, a federal court applies the substantive law of the forum state."); Pizza Magia Int'l, LLC v. Assurance Co. of Am., 447 F. Supp. 2d 766, 770 (W.D. Ky. 2006). Under Kentucky law, an insurer has the duty to defend the insured "if there is any allegation which potentially, possibly or might come within the coverage of the policy." James Graham

5

Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 279 (Ky. 1991) (citation omitted). In other words, the "insurance company must defend any suit in which the language of the complaint would bring it within the policy coverage regardless of the merit of the action." Id.

### "OCCURRENCE"

As an initial matter, the parties disagree over whether the underlying complaint alleges a covered "occurrence." As noted above, the CGL policy in this case provides coverage for claims of bodily injury and property damage if that injury or damage is caused by an "occurrence." The term "occurrence" is defined as an "accident." The term "accident" is not defined. (Id. at 13, 31.) In Cincinnati Ins. Co. v. Motorist Mutual Ins. Co., the Kentucky Supreme Court analyzed the meaning of the term "accident" in the context of determining whether a similar CGL policy's "occurrence" requirement had been met. 306 S.W.3d 69, 73-76 (Ky. 2010). In so doing, the Court held that the term "accident" must be afforded its ordinary meaning, as the term is not ambiguous and has not acquired a technical meaning in the realm of insurance law. Id. at 73-74. The Court went on to state that the doctrine of fortuity is inherent in the ordinary meaning of the term "accident." Fortuity "consists of two central aspects": intent and control. Id. at 74.

In this case, the parties dispute whether the alleged outcome of Richie's actions—namely, the prescription drug abuse in West Virginia which costs the State of West Virginia "hundreds of millions of dollars annually," (Compl. [DN 20-2] ¶¶ 1-2)—can be properly deemed "accidental." In making their respective arguments, the parties highlight both aspects of the fortuity doctrine: intent and control. The Court will consider each aspect below.

**Intent.** In Motorists Mutual Insurance Co., the Kentucky Supreme Court recognized that a loss or harm is fortuitous "if it was not intended . . . ." 306 S.W.3d at 74 (internal quotation marks and citation omitted). In other words, "a loss or harm is not fortuitous if the loss or harm is

6

caused intentionally by [the insured]." Id. In this case, Richie argues that the alleged harm is fortuitous and properly deemed "accidental" since it did not intend, nor could it have reasonably anticipated, that distributing prescription drugs in response to orders it received from pharmacies would lead to widespread drug addiction. (See Mem. in Supp. of Mot. for Summ. J. ("Richie's Mem.") [DN 20-1] 12-13.) According to Richie, Cincinnati must defend it in the West Virginia action because the AG's complaint contains negligence allegations, and because those allegations "potentially, possibly or might" come within the coverage of the policy. (See id. at 12-17; see also Resp. to Pl.'s Mot. for Decl. J. ("Richie's Resp.") [DN 23] 13-20.)

In support of this position, Richie highlights that the complaint sounds in negligence, as it is "filled with allegations of negligence and theories of liability that are based on negligence." (Richie's Mem. [DN 20-1] 14; Richie's Resp. [DN 23] 11-18.) For example, the AG's complaint alleges that Richie "knew or should have known" that its products "were not being prescribed and consumed for legitimate medical purposes." (Compl. [DN 20-2] ¶ 42.) According to Richie, since there are allegations of negligence, there are allegations that it did not intentionally cause the alleged harm. Accordingly, the harm can be construed as "fortuitous," an "accident," and an "occurrence," triggering Cincinnati's duty to provide a defense. (See Richie's Mem. [DN 20-1] 14; Richie's Resp. [DN 23] 14-17.) Richie argues that the negligence allegations in the AG's complaint cannot be ignored simply because the complaint also alleges intentional actions. (Id.)

In additional support of its position, Richie notes that the existence of regulations with respect to the distribution of controlled substances, and the penalties associated with violating them, shows that the alleged widespread drug addiction "is more reasonably considered to be the 'unanticipated result' of Richie's distributions to state-regulated pharmacies." (Richie's Resp. [DN 23] 13.) Further, Richie argues that it distributed its products in response to orders received

from pharmacies—and that its reasonable expectation was that the pharmacies would dispense the medications to patients presenting valid prescriptions written by licensed physicians. (Id.)

Cincinnati, by contrast, argues that the alleged harm in this case is neither fortuitous nor properly deemed "accidental." In this respect, Cincinnati argues that all of the claims asserted by West Virginia in the AG's complaint are based on Richie's alleged intentional involvement in the state's prescription drug abuse epidemic. According to Cincinnati, there is nothing "fortuitous" or "accidental" about Richie's alleged actions; thus, the claims asserted against Richie do not arise from an "occurrence." (Mem. in Supp. of Mot. for Decl. J. ("Cincinnati's Mem.") [DN 21-1] 10; Resp. in Opp. to Richie's Mot. for Summ. J. ("Cincinnati's Resp.") [DN 22] 10.) In support of this position, Cincinnati argues that the "entire premise of the State of West Virginia's lawsuit . . . is that Richie Enterprises, and the other defendants, provided excessive amounts of prescription drugs to pharmacies in West Virginia." (Cincinnati's Mem. [DN 21-1] 11.) Cincinnati states that because the result of this conduct was entirely foreseeable, the claims in the underlying lawsuit cannot be considered fortuitous. (See id.)

The Court considers Richie's position more persuasive and holds that the AG's complaint sets forth allegations that the alleged harm is fortuitous and properly deemed "accidental" since Richie did not intend for the alleged drug addiction to occur. While Cincinnati correctly points out that the underlying complaint includes allegations of intentional conduct, Cincinnati seems to overlook that the complaint also contains allegations of negligent conduct. (See, e.g., Compl. [DN 20-2] ¶¶ 5 ("Defendants have acted negligently"); 16 ("Defendants have failed to diligently respond to suspicious orders which the Defendants have filled"); 52-53 (Defendants both had and breached "a duty to exercise reasonable care in the marketing, promotion and distribution of controlled substances"); 55 ("Defendants were negligent in failing to guard against third-party

misconduct"); 58 ("Defendants are negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers"). Cincinnati is simply incorrect when it states that all of the claims asserted by West Virginia in the AG's complaint are based on Richie's intentional actions. Moreover, the Court agrees with Richie that the allegations of negligence in the AG's complaint are, in essence, allegations that Richie did not intentionally cause the alleged harm. Therefore, the Court finds that with respect to the intent aspect of the fortuity doctrine, the alleged harm can properly be deemed "fortuitous," an "accident," and an "occurrence."

The Court's conclusion is supported by the holding of Liberty Mutual Fire Insurance Co. v. J M Smith Corp., 2013 WL 5372768 (D.S.C. Sept. 24, 2013). In that case, a district court in South Carolina was presented with a similar declaratory judgment action. The court was asked to determine the scope of an insurer's defense obligations to its insured under a CGL policy in the same West Virginia case where Richie is named as a party. Id. at *1. The court denied the insurer's summary judgment motion and granted the insured's summary judgment motion, holding that the insurer owed its insured a defense in the West Virginia case. Id. at *6.

In reaching this conclusion, the court reasoned that the underlying complaint contained specific allegations of negligence. Therefore, the facts did not support only knowing misconduct, as the insurer argued. Id. at *5. The court also reasoned that "the results in [the West Virginia action], creating a pill mill with widespread addiction, cannot be said to be a *normal* consequence of distributing prescription drugs to three pharmacies in a state over a limited time." Id. Finally, the court reasoned that while the acts alleged in the state complaint were "arguably based upon intentional acts which resulted in violations of West Virginia law," the "conduct of distributing

9

prescription drugs based upon orders placed by pharmacies is not, in and of itself, illegal and the violation of laws cannot be reasonably anticipated—especially as to [the insured] . . . ." Id. at *6.

The Court agrees with the reasoning of the court in Liberty Mutual. The AG's complaint contains specific allegations of negligence. Thus, the factual allegations do not show only knowing misconduct, as Cincinnati argues. Because there are allegations of negligence, there are likewise allegations that Richie did not intend for the alleged prescription drug abuse in West Virginia to occur. Accordingly, with respect to the intent aspect of the fortuity doctrine, it appears that Richie is entitled to a defense from Cincinnati. This, however, does not end the analysis. Instead, the Court must turn to the second aspect of the fortuity doctrine: control.

**Control.** When analyzing whether a particular outcome is "accidental," the court's focus must not be solely on whether an insured intended a particular outcome. Instead, the court must also focus on whether the outcome was "a chance event beyond the control of the insured." See Motorists Mutual Ins. Co., 306 S.W.3d at 76 (internal quotation marks and citation omitted). In other words, a court must "bear in mind that a fortuitous event is one that is beyond the power of any human being to bring . . . to pass, [or is] . . . within the control of third persons . . . ." Id.

Regarding the control aspect, Richie argues that the alleged prescription drug abuse epidemic is fortuitous because its creation was beyond Richie's control—and within the control of third persons. In this respect, Richie states that it did not intend, nor could it have reasonably anticipated, that "a criminal collaboration among complicit pharmacies, physicians and patients would produce the 'effect' – the addiction and additional medical injuries of patients who procured illegal prescriptions." (Richie's Resp. [DN 23] 13.) In other words, Richie states that the effect was "totally out of Richie's control and completely in the control of third persons"— namely, the pharmacists, physicians, and end-users of the prescription drugs. (See Reply in Supp.

10

of its Mot. for Summ. J. [DN 27] 9, 11.) According to Richie, "[a]ny injuries or accidental harm that occurred after Richie legally sold and shipped its products to licensed pharmacies was totally out of its control." As such, the "necessary fortuity required by the law is satisfied to trigger a coverable occurrence under the policy." (Id. at 9.)

Cincinnati responds that the alleged prescription drug abuse epidemic is not fortuitous, as its creation was within Richie's control. In this respect, Cincinnati compares the facts of this case to the facts of Motorists Mutual. In Motorists Mutual, the Kentucky Supreme Court held that a claim of defective construction against a homebuilder is not, standing alone, a claim for property damage caused by an "occurrence" under a CGL policy. 306 S.W.3d at 71. Ultimately, the Court reasoned that while it was "highly unlikely that [the homebuilder] subjectively intended to build a substandard house," id. at 74, the event was not fortuitous since the homebuilder "had control over the construction of the . . . home, either directly or through the subcontractors it chose." Id. at 76. According to the Court, because one could not logically say that the allegedly substandard construction was a "fortuitous, truly accidental, event," the faulty workmanship claim was not covered by the CGL policy. Id. at 76. In this case, Cincinnati argues that a similar conclusion is warranted because the "supplying of pharmaceutical drugs to pharmacies in West Virginia was [not] a 'fortuitous, truly accidental, event.'" (Cincinnati's Mem. [DN 21-1] 11.)

The Court finds Cincinnati's argument unpersuasive and thus agrees with Richie that the allegations of negligent conduct in the complaint support a decision that the alleged prescription drug abuse epidemic is fortuitous since its creation was beyond Richie's control. In Motorists Mutual, there was no question that the alleged faulty construction was within the contractor's control. The contractor could determine whether the construction was acceptable or substandard, as he had the ability to either complete the work himself or hire a subcontractor to perform the

11

job. 306 S.W.3d at 76. In this case, though, the alleged harm is the prescription drug abuse epidemic in West Virginia, and its creation extended beyond Richie's control. The pharmacies in West Virginia dispensed the prescription drugs to people who presented seemingly valid prescriptions. There is no allegation that Richie "controlled" the pharmacies—let alone to whom the pharmacists dispensed the drugs —in the same manner that a contractor controls his subcontractors. Likewise, physicians wrote the prescriptions for the end-users of the drugs. Again, there is no allegation that Richie controlled the physicians in the same manner that a contractor controls his subcontractors. Accordingly, the Court finds that the fortuity required by law is satisfied to trigger a coverable occurrence under the CGL policy. The decision in Motorists Mutual is distinguishable from the present case.

### "BODILY INJURY" OR "PROPERTY DAMAGE"

The Court's determination that the underlying complaint alleges a covered "occurrence," however, does not end the analysis with respect to whether Cincinnati owes Richie a defense under the subject CGL policy. This is because the policy provides that Cincinnati only has a duty to defend against suits that seek damages because of "bodily injury" or "property damage" which is caused by an "occurrence." (See Policy [DN 21-3] 13.) In this respect, Cincinnati argues that coverage does not exist under the policy since the State of West Virginia is not seeking damages for either "bodily injury" or "property damage." Instead, Cincinnati maintains that West Virginia is seeking damages for its economic losses—namely, the money it has been required to spend because of the prescription drug abuse epidemic in West Virginia. Cincinnati states that such losses do not come within the definition of "bodily injury." (Cincinnati's Mem. [DN 21-1] 12-13; Cincinnati's Resp. [DN 23] 13-14.) Further, Cincinnati states that there is no allegation that the State of West Virginia is seeking damages for any property damage, which is defined in the

12

CGL policy as physical injury to tangible property. According to Cincinnati, since the AG is not seeking damages for bodily injury or property damage, there can be no insurance coverage. (Id.)

While Richie does not clearly articulate a response to this argument, it seems to the Court that Richie implicitly argues that the underlying complaint does seek damages for "bodily injury," as West Virginia's action is based on the alleged prescription drug abuse epidemic and the bodily injury of West Virginia citizens. (See Richie's Resp. [DN 23] 19-20.) For the following reasons, the Court agrees with Richie's position and holds that the complaint seeks damages for "bodily injury."

As Cincinnati highlights, the underlying complaint is filled with allegations which show that the State of West Virginia seeks economic damages—i.e. the money it has been required to spend due to the prescription drug abuse epidemic. But in addition to seeking damages for economic harm, the AG's complaint also contains allegations which seek damages for "bodily injury." Specifically, in Count VII, the AG brings a claim for the costs of a "medical monitoring" program. (Compl. [DN 20-2] ¶¶ 61-66.) The AG alleges that the "increased susceptibility to death, injuries and irreparable harm to the health of abusers and dependent users resulting from their exposure to prescription drugs can only be mitigated or addressed by the creation of a Court-supervised fund, financed by the Defendants, that will fund a comprehensive medical monitoring program . . . ." (Id. ¶ 64.) The AG also alleges that "[p]rescription drug users in West Virginia have no adequate remedy at law in that monetary damages alone do not compensate for the continuing nature of the harm to them . . . ." (Id. ¶ 65.) Further, the AG alleges that "[w]ithout a court-approved medical treatment monitoring program, the relevant product users will not receive prompt medical care which could detect and prolong their productive lives, increase prospects for improvement and minimize disability." (Id. ¶ 66.) These allegations show

that in addition to seeking damages for economic harm, the State of West Virginia is seeking to recover damages on behalf of its citizens for "bodily injury." See Baughman v. U.S. Liab. Ins. Co., 662 F. Supp. 2d 386, 396 (D.N.J. 2009) ("The underlying plaintiffs have brought suit to procure, among other things, the costs of medical monitoring 'as damages' for the 'bodily injury' they allegedly suffered due to exposure to dangerous levels of mercury and so the underlying suit falls within the general coverage of the CGL policy.").

### INTENTIONAL AND CRIMINAL ACT EXCLUSION

As a final matter, Cincinnati argues that coverage does not exist under the subject CGL policy because its intentional act and criminal act exclusion defeats any possibility for coverage. With respect to this argument, Cincinnati maintains that in the AG's complaint, the allegations of intentional and criminal conduct on Richie's part are plentiful. Thus, Cincinnati states that as a matter of law, West Virginia's problems could reasonably be expected to result from Richie's intentional and criminal conduct. Cincinnati argues that even if coverage might otherwise exist, the policy's exclusion applies to negate coverage. (Cincinnati's Mem. [DN 21-1] 13-14.)

In support of this position, Cincinnati cites Thompson v. West American Insurance Co., 839 S.W.2d 579 (Ky. App. 1992). In that case, the insured argued that the insurer had a duty to defend it because the underlying complaint contained negligence allegations. The Kentucky Court of Appeals rejected this argument, holding that the "allegations of the complaint cannot compel a defense if coverage does not exist." Id. at 581. The Court also held that the "obligation to defend arises out of the insurance contract, not from the allegations of the complaint against the insured." Id. According to Cincinnati, the Court must similarly hold that coverage does not exist in this case. Cincinnati argues that the allegations of intentional and criminal conduct make the intentional and criminal act exclusion applicable—even if coverage might otherwise exist.

The Court finds, however, that Cincinnati's argument is without merit. As discussed above, the conduct of distributing prescription drugs based upon orders placed by pharmacies is not, in and of itself, illegal and the violation of laws cannot be reasonably anticipated. Further, the underlying complaint contains allegations that fall within the insurance policy's language, as there are allegations that the prescription drug abuse epidemic was "fortuitous," an "accident," and an "occurrence." Moreover, under Kentucky law, any exceptions and exclusions in insurance policies "must be 'strictly construed [against the insurer] to make insurance effective.'" See Deerfield Ins. Co. v. Warren Cnty. Fiscal Ct. *ex rel.* City-Cnty. Planning Comm'n, 88 S.W.3d 867, 873 (Ky. App. 2002) (citation omitted). Thus, the Court finds that the policy's intentional and criminal act exclusion does not negate coverage in this case.

In this respect, the Court notes that Cincinnati's reliance on Thompson is misplaced. As Richie correctly notes, in that case, the insured had been sued for sexual molestation—and the Kentucky Court of Appeals held it was "inconceivable that a criminal act of sexual molestation, the essence of which is gratification of sexual desire, could possibly be an 'occurrence' for purposes of insurance coverage." 839 S.W.2d at 581. In other words, sexual molestation could not be fairly characterized as negligent or accidental, regardless of the fact that there were allegations of negligence in the underlying complaint. See id. Here, though, the Court has held that the alleged prescription drug abuse epidemic can be fairly characterized as accidental. Thus, Thompson is distinguishable from the current action. The intentional and criminal act exclusion does not negate coverage. Accordingly, the Court concludes that Cincinnati has a duty to defend Richie under the CGL policy. As to this issue of defense, Cincinnati's motion for declaratory judgment [DN 21] is **DENIED** and Richie's summary judgment motion [DN 20] is **GRANTED**.

**B. DUTY TO INDEMNIFY**

Under Kentucky law, the obligation to defend the insured "is separate from the duty to provide coverage and to pay." Wolford v. Wolford, 662 S.W.2d 835, 838 (Ky. 1984). With respect to the duty to indemnify, Richie argues that if, for some reason, a judgment is later entered against it in the West Virginia lawsuit, Cincinnati is obligated as a matter of law to indemnify it in full. According to Richie, "[a]ny judgment against Richie . . . would be based on an express negligence claim or a claim that is premised on negligence despite some labels to the contrary in the complaint." (Richie's Resp. [DN 23] 21.) Richie thus urges the Court to declare that Cincinnati has a duty to indemnify it for any judgment that may be entered against it. (Id.)

In its response, Cincinnati argues that the underlying complaint is replete with allegations of intentional and illegal behavior on behalf of Richie. Thus, if liability is imposed on Richie for its intentional or illegal conduct, there can be no coverage for that liability—because the policy's exclusions for intentional and illegal conduct would apply to negate the possibility of coverage. (Cincinnati's Resp. [DN 22] 1-2.) Cincinnati urges the Court to declare that has no duty to indemnify Richie for any judgment that might be entered against it in the West Virginia lawsuit.

The Court finds that at this point in the litigation, neither party is entitled to judgment on the indemnity issue. Contrary to Richie's assertion, it is not necessarily true that any judgment against Richie would be based on a negligence claim or a claim premised on negligence. Instead, the Court finds it equally likely that a judgment would be based on Richie's alleged intentional conduct. Similarly, contrary to Cincinnati's assertion, it is not certain that any judgment against Richie would be based on Richie's alleged intentional conduct. Instead, it is equally likely that a judgment would be based on Richie's alleged negligence. Therefore, the Court chooses to wait to rule on the indemnity issue until there is a judgment entered in the underlying action. Regarding

the indemnity issue, Cincinnati's motion for declaratory judgment [DN 21] is **DENIED** and Richie's summary judgment motion [DN 20] is **DENIED**.

## IV. Conclusion

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiff Cincinnati's motion for declaratory judgment [DN 21] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Richie's summary judgment motion [DN 20] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to the defense issue. It is **DENIED** as to the indemnity issue.

                                                  **Joseph H. McKinley, Jr., Chief Judge**
                                                      **United States District Court**

cc: counsel of record
                                                                         March 4, 2014